

# IN THE
# Court of Appeals of Indiana

Nicholas R. E. Brummett,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Mar 12 2024, 9:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

March 12, 2024

Court of Appeals Case No.
23A-CR-1298

Appeal from the Madison Circuit Court

The Honorable Andrew Hopper, Judge

Trial Court Cause No.
48C03-2003-F2-735

---

**Opinion by Judge Brown**
Judge Bradford concurs.
Judge Vaidik dissents with separate opinion.

**Brown, Judge.**

[1] Nicholas R. E. Brummett appeals his conviction for possession of methamphetamine as a level 3 felony.[1] We affirm.

**Facts and Procedural History**

[2] At 8:42 p.m. on March 21, 2020, Anderson Police Officer Brandon Reynolds was patrolling in an area known as a "high traffic area for narcotics" and noticed a silver car drive down an alley, stop at a stop sign, and it "seemed like it wanted to turn one (1) way and then turned another." Transcript Volume I at 57, 81. Officer Reynolds observed that the driver "seemed like [he] was lost or like [he] was looking for something," in an area where "there's a lot of drug activity," which "caught [Officer Reynolds's] eye." *Id.* at 57. He observed that the vehicle turned without properly using the turn signal. Specifically, the vehicle stopped, the driver "then started his turn, and then clicked his turn signal on." *Id.* at 58. Officer Reynolds observed that the vehicle which had been traveling south ultimately turned back north which "sort of set off another flag" for him. *Id.* The vehicle then drove south again.

[3] Officer Reynolds initiated a traffic stop. The vehicle stopped, and Officer Reynolds approached Brummett who was the sole occupant and asked him if

---

[1] The State notes that Brummett's argument implicates the validity of only his conviction for methamphetamine. *See* Appellee's Brief at 9 n.1. Brummett did not file a reply brief, and he has not developed an argument challenging his conviction for operating a vehicle as an habitual traffic violator as a level 6 felony.

he had his driver's license. Brummett handed him an ID card and said he did not have a driver's license. Officer Reynolds asked Brummett where he was going, and Brummett said he was going to the gas station "that was just up in front of [them] a couple blocks." *Id.* at 119. Officer Reynolds asked Brummett if he was from Anderson, and Brummett answered affirmatively. Officer Reynolds found Brummett's answer odd "because pretty much anybody from Anderson knows where thirty-second (32nd) and Columbus is and that gas station there." *Id.* at 119-120. Officer Reynolds then asked him where he was coming from and if he was lost, and Brummett said he was coming from "a buddy's house." *Id.* at 61. Officer Reynolds asked him what his friend's name was because he knew people in the area and "was going to try to help him out if he's just a lost guy." *Id.* Brummett "just like didn't respond" and "just sort of sat there with his hands on the steering wheel and at that time like he was acting really nervous," which made Officer Reynolds uncomfortable. *Id.* Officer Reynolds also observed that Brummett's eyes "were making some pretty furtive movements," *id.*, and that he "just like kind of started freaking out a little bit." *Id.* at 71.

[4]     Due to his safety concerns, Officer Reynolds asked Brummett to exit the vehicle. Officer Reynolds conducted a patdown, ran his hand across the outside of Brummett's right pocket, felt "an item through plain feel that felt consistent to be a pretty large amount of crystal methamphetamine" and felt the same thing in a smaller quantity in Brummett's left pocket. *Id.* at 123. He asked Brummett if he had meth in his pocket, Brummett said he did not know

but also said that he could reach in and grab it for him, and Officer Reynolds told Brummett no. Officer Reynolds placed Brummett in handcuffs and retrieved the methamphetamine from his pockets. Officer Sean Brady arrived at the scene.[2] Officer Reynolds arranged for the vehicle to be towed, and he and Officer Brady conducted an inventory search of the vehicle. Officer Reynolds also ran a license check on Brummett and found that he was an habitual traffic violator.

[5] On March 23, 2020, the State charged Brummett with: Count I, dealing in methamphetamine as a level 2 felony; Count II, possession of methamphetamine as a level 3 felony; Count III, operating a vehicle as an habitual traffic violator as a level 6 felony; Count IV, unlawful possession of a syringe as a level 6 felony; Count V, carrying a handgun without a license as a

---

[2] At the hearing on the motion to suppress, Officer Reynolds testified: "I went ahead and asked him to exit the vehicle at that time. [T]ypically what I do before I have someone actually exit the vehicle, um I'll you know, he told me he didn't have a driver's license, so he's not going to be driving away from there, I would wait for my back up to actually show up before I get someone out of the vehicle. Um, but because of the safety concerns that I had um I felt like it was important to go ahead and get him out the [sic] vehicle that way I could try to separate him from the vehicle incase [sic] he wanted to try to take off in it or if he had some type of weapon or something try to separate him from that and just try to eliminate the threat, the potential security risk the best I could." Transcript Volume I at 62. He later stated: "Yeah um at that time all the flags were going off. I was like okay like you know this guy has meth in his pockets. Um, this would explain some of his nervousness and everything so um I went ahead and put him into handcuffs then. Um, and I think around that time Officer Brady ended up showing up. Somewhere around there. He could've just before or just after that not exactly sure. And then I went in and retrieved the meth from his pockets." *Id.* at 65. At trial, when asked what was the first thing he saw when he arrived on the scene, Officer Brady answered: "I saw um Officer Reynolds' [sic] with his patrol commission with his lights on um, so I arrived on scene and spoke with him and asked what he needed." *Id.* at 146. When asked what he did next, he answered: "Um, I just basically stood by, um while he was going back and forth between his car and doing things um, I know he did have the suspect contained in some capacity so I can't remember where exactly I was, but I was just kind of waiting for him to tell me what to do next." *Id.*

class A misdemeanor; and Count VI, possession of a controlled substance as a class A misdemeanor.

[6] On February 23, 2022, Brummett filed a motion to suppress. On May 19, 2022, the court held a hearing. Officer Reynolds stated: "[A]t that time like you know he told me he didn't have a driver's license, so I was like okay a lot of people don't have a driver's license, but we'll see why and everything else." *Id.* at 60. On cross-examination, when asked for the reason for conducting a patdown, Officer Reynolds answered: "[I]n order to ensure that there was no type of weapon or anything that would be on his possession. So, safety." *Id.* at 69. Brummett's counsel asked: "Had he given you some reason to believe at that point that he would have a weapon on his person?" *Id.* Officer Reynolds answered: "Um I think it's very common for most people to carry weapons. I myself almost have at least have a knife on my person and um a lot of people carry weapons." *Id.* Defense counsel asked: "So, that was the reason you patted him down?" *Id.* Officer Reynolds answered: "Because well for safety and because um it's very common for people to carry weapons." *Id.* On redirect examination, the prosecutor asked if it was correct that Brummett's behavior also led to the patdown. Officer Reynolds answered: "Oh yeah absolutely." *Id.* On recross-examination, defense counsel asked if Brummett's act of no longer talking and nervousness were the reason for the patdown, and Officer Reynolds answered: "Yeah those were things through my experiences . . . made me believe there might be a safety concern." *Id.* at 72.

On June 2, 2022, the State filed a brief in opposition to Brummett's motion to suppress and argued that Officer Reynolds had concern for his safety and he was also aware that Brummett "did not have a valid driver's license, which in and of itself is an arrestable offense under I.C. 9-24-18-1." Appellant's Appendix Volume II at 89.

On August 16, 2022, the court entered an order denying Brummett's motion to suppress and stating that its "analysis turns on the key fact of the defendant's commission of a crime. Before the defendant was searched the officer had knowledge of the defendant's criminal activity, subjecting him to arrest and being taken into custody for operating a vehicle without a valid license." *Id.* at 97. On September 13, 2022, Brummett filed a motion to reconsider the order denying his motion to suppress. On September 28, 2022, the court held a hearing at which it stated that the motion to suppress remained denied. That same day, the court entered an order observing that the motion to suppress remained denied and stating in part:

> On direct examination [O]fficer Reynolds testified he asked the defendant if he had his driver's license to which the defendant responded that he did not have drivers [sic] license. IC 9-24-18-1 states an individual who knowingly or intentionally operates a motor vehicle upon a highway and has never received a valid driver's license commits a Class C misdemeanor. The Defendant did not inform [O]fficer Reynolds that he had a license that was suspended, he stated he did not have a license. The officer then proceeded to ask the defendant to step out of the vehicle and conduct a search of his person.

*Id.* at 105.

[9] On April 10, 2023, the court held a bench trial. The prosecutor moved to dismiss Counts I and VI, and the court granted the motion. The court incorporated the record from the suppression hearing. Officer Reynolds testified that the inventory search of the vehicle revealed a pistol, a bag with methamphetamine, pills, and needles. He testified he ran a license check on Brummett and found he had no handgun permit. He further testified that Brummett's acting uncomfortable was a concern for him and that "[b]ased off my training and experience people who . . . are acting nervous and uncomfortable as he was . . . it can likely lead to a vehicle pursuit, a very dangerous situation for . . . him, for the public, and for myself." Transcript Volume I at 122. After Officer Reynolds testified that he felt methamphetamine in Brummett's pockets, defense counsel objected to further testimony based on the Fourth Amendment, the Indiana Constitution, and *Terry v. Ohio*. The court overruled the objection. The court also stated that its previous ruling on the motion to suppress was "based on all of the circumstances surrounding the stop." *Id.* at 143. The court found Brummett guilty of Counts II and III and not guilty of Counts IV and V.

**Discussion**

[10] Brummett cites the Fourth Amendment and argues that the trial court abused its discretion when it admitted the items seized during the patdown.[3] He does not challenge the propriety of the initial traffic stop based upon his failure to properly use his turn signal or Officer Reynolds's request for him to exit the vehicle. Rather, he challenges only the subsequent patdown. He appears to argue that the search incident to arrest exception did not apply because Officer Reynolds did not have probable cause to believe an offense occurred relating to his driver's license. He asserts that Officer Reynolds's statement regarding his license status established that he was curious as to why he did not have a license and without the clear existence of probable cause the encounter was along the lines of a *Terry* stop. He also asserts that Officer Reynolds could not point to any specific reasonable inferences, or articulable facts that established any basis to perceive him as being armed. He further contends that Officer Reynolds "testified that upon feeling the item in [his] pocket he thought it to be methamphetamine, not a weapon of any kind," and also states that Officer Reynolds "did not provide any testimony . . . that the item he felt in

---

[3] Brummett cites Article 1, Section 11 of the Indiana Constitution. However, he does not make a separate analysis under the Indiana Constitution. We therefore address only his argument under the Fourth Amendment. *See White v. State*, 772 N.E.2d 408, 411 (Ind. 2002) ("Because the defendant does not argue that the search and seizure provision in the Indiana Constitution requires a different analysis than the federal Fourth Amendment, his state constitutional claim is waived, and we consider only the federal claim.") (citing *Warren v. State*, 760 N.E.2d 608, 610 n.3 (Ind. 2002); *Williams v. State*, 724 N.E.2d 1093, 1097 n.5 (Ind. 2000); *Brown v. State*, 703 N.E.2d 1010, 1015 n.4 (Ind. 1998); *Fair v. State*, 627 N.E.2d 427, 430 n.1 (Ind. 1993)).

Brummett's pocket was immediately apparent as contraband." Appellant's Brief at 13-14.

[11] Generally, we review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied*. We reverse only when the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*. We may affirm a trial court's decision regarding the admission of evidence if it is sustainable on any basis in the record. *Barker v. State*, 695 N.E.2d 925, 930 (Ind. 1998), *reh'g denied*. We review *de novo* a ruling on the constitutionality of a search or seizure, but we give deference to a trial court's determination of the facts, which will not be overturned unless clearly erroneous. *Campos v. State*, 885 N.E.2d 590, 596 (Ind. 2008); *see also Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014) (holding that the ultimate determination of the constitutionality of a search or seizure is a question of law that we consider *de novo*). In ruling on admissibility following the denial of a motion to suppress, the trial court considers the foundational evidence presented at trial. *Carpenter*, 18 N.E.3d at 1001. If the foundational evidence at trial is not the same as that presented at the suppression hearing, the trial court must make its decision based upon trial evidence and may consider hearing evidence only if it does not conflict with trial evidence. *Guilmette v. State*, 14 N.E.3d 38, 40 n.1 (Ind. 2014). It also considers the evidence from the suppression hearing that is favorable to the defendant only to the extent it is uncontradicted at trial. *Carpenter*, 18 N.E.3d at 1001.

The Fourth Amendment provides, in pertinent part: "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. "As the text makes clear, 'the ultimate touchstone of the Fourth Amendment is "reasonableness."'" *Riley v. California*, 573 U.S. 373, 134 S. Ct. 2473, 2482 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943 (2006)).

With respect to Brummett's argument under the search incident to arrest exception, the United States Supreme Court has held that "[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." *United States v. Robinson*, 414 U.S. 218, 235, 94 S. Ct. 467, 477 (1973). "It is the fact of the lawful arrest which establishes the authority to search, and . . . in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." *Id.* "The making of a formal arrest is not determinative of the officers' right to conduct a valid search incident to arrest." *Smith v. State*, 256 Ind. 603, 608, 271 N.E.2d 133, 137 (1971). *See also VanPelt v. State*, 760 N.E.2d 218, 223 (Ind. Ct. App. 2001) ("The critical issue is not *when* the arrest occurs but whether there was probable cause to arrest at the time of the search. It is well settled that as long as probable cause exists to make the arrest, the fact that a suspect was not

formally placed under arrest at the time of the search incident thereto will not invalidate the search."), *trans. denied*.

[14] "The evidence required to establish guilt is not necessary for probable cause for an arrest to exist." *Roberts v. State*, 599 N.E.2d 595, 598 (Ind. 1992), *reh'g denied*. "'In addition, because the situations that officers face "in the course of executing their duties are more or less ambiguous," probable cause allows for reasonable mistakes by the officer.'" *Decker v. State*, 19 N.E.3d 368, 377 (Ind. Ct. App. 2014) (quoting *United States v. Moore*, 215 F.3d 681, 686 (7th Cir. 2000) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 112, 95 S. Ct. 854, 43 L.Ed.2d 54 (1975)), *cert. denied*, 531 U.S. 915, 121 S. Ct. 271 (2000)), *trans. denied*. "[A]n officer may arrest a person if he has probable cause – meaning 'knowledge of facts and circumstances which would warrant a man of reasonable caution to believe that the defendant committed the criminal act in question.'" *Kelly v. State*, 997 N.E.2d 1045, 1051 (Ind. 2013) (quoting *Peterson v. State*, 674 N.E.2d 528, 536 (Ind. 1996) (quoting *Bergfeld v. State*, 531 N.E.2d 486, 490 (Ind. 1988)), *reh'g denied*, *cert. denied*, 522 U.S. 1078, 118 S. Ct. 858 (1998)). "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S. Ct. 588, 593 (2004). "That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Id.* at 153, 125 S. Ct. at 594. "The amount of evidence necessary to meet the probable cause requirement is determined on a case-by-case basis, and the facts and circumstances need not relate to the same crime with which the

suspect is ultimately charged." *Ortiz v. State*, 716 N.E.2d 345, 348 (Ind. 1999) (citations omitted).

[15]     Ind. Code § 9-24-18-1, which was cited in the State's brief in opposition to the motion to suppress and the trial court's September 28, 2022 order, is titled "Driving without a license" and provided at the time of the traffic stop that "[a]n individual, except an individual exempted under IC 9-24-1-7, who knowingly or intentionally operates a motor vehicle upon a highway and has never received a valid driver's license commits a Class C misdemeanor" and that "[i]n a prosecution under this section, the burden is on the defendant to prove by a preponderance of the evidence that the defendant . . . had been issued a driver's license or permit that was valid . . . at the time of the alleged offense."[4]  Officer Reynolds testified that he asked Brummett if he had a valid driver's license and Brummett merely handed him an ID card and said he did not have a driver's license.  We acknowledge that Ind. Code § 9-24-1-1 provided at the time of the traffic stop that "an individual must have a valid . . . driver's license . . . or permit . . . to operate upon a highway the type of motor vehicle for which the driver's license . . . was issued" and that "[a]n individual who violates this section commits a Class C infraction."[5]  However, mindful of the idea that the evidence required to establish guilt is not necessary for probable

---

[4] Subsequently amended by Pub. L. No. 111-2021, § 77 (eff. Jan. 1, 2022).

[5] Subsequently amended by Pub. L. No. 111-2021, § 34 (eff. Jan. 1, 2022); Pub. L. No. 211-2023, § 28 (eff. July 1, 2023).

cause for an arrest to exist, we conclude that the facts and circumstances would warrant a person of reasonable caution to believe that Brummett committed the act of driving without a license as a class C misdemeanor. Accordingly, we conclude that the search incident to arrest exception applies.

[16] We pause to comment on the distinction between the infraction governed by Ind. Code § 9-24-1-1 and the misdemeanor governed by Ind. Code § 9-24-18-1. We acknowledge that the Indiana Supreme Court has noted in a case which did not discuss the search incident to arrest exception that "Indiana law permits a law enforcement officer to arrest without a warrant when he has probable cause to believe the person is committing a misdemeanor in the officer's presence" and that "[i]t does not permit a warrantless 'arrest,' defined as 'the taking of a person into custody, that he may be held to answer for a crime,' for an infraction." *Taylor v. State*, 842 N.E.2d 327, 333 n.6 (Ind. 2006) (citing Ind. Code § 35-33-1-1(A)(4) (1996); Ind. Code § 35-33-1-5 (1983); Ind. Code § 34-28-5-1 (setting forth the procedure for actions taken under this provision and declaring they "shall be conducted in accordance with the Indiana Rules of Trial Procedure.").[6] This Court has previously discussed the impact of whether an infraction or a misdemeanor has occurred in analyzing a claim under the Fourth Amendment. In *Kyles v. State*, 888 N.E.2d 809, 812 (Ind. Ct. App.

---

[6] At the time of the traffic stop in the present case, Ind. Code § 35-33-1-1 provided that "[a] law enforcement officer may arrest a person when the officer has . . . probable cause to believe the person is committing or attempting to commit a misdemeanor in the officer's presence." (Subsequently amended by Pub. L. No. 175-2022, § 6 (eff. July 1, 2022); Pub. L. No. 112-2023, § 3 (eff. July 1, 2023)).

2008), the defendant relied on Ind. Code § 35-33-1-1(a)(4), asserted that

possession of paraphernalia could be classified as an infraction, a misdemeanor,

or a felony depending on the circumstances, and argued that because the record

failed to demonstrate whether probable cause existed to classify the possession

as a misdemeanor or felony, the officer lacked authority to make a warrantless

arrest. This Court first noted that it was skeptical of the defendant's argument

in light of the United States Supreme Court's decision in *Virginia v. Moore*, 553

U.S. 164, 128 S. Ct. 1598 (2008). 888 N.E.2d at 812. We observed:

> In *Moore*, the Court held that state regulation of officers'
> authority to make warrantless arrests does not alter the
> protections and remedies available under the Fourth
> Amendment. *See* [*Moore*, 128 S. Ct.] at 1607. In so holding, the
> Court reaffirmed the Fourth Amendment standard for
> warrantless arrests: "When officers have probable cause to
> believe that a person has committed a crime in their presence, the
> Fourth Amendment permits them to make an arrest, and to
> search the suspect in order to safeguard evidence and ensure their
> own safety." *Id.* at 1608. Although the Court did not explicitly
> state what type of crime would authorize a warrantless arrest, it
> suggested that the threshold is fairly low. *See id.* at 1604 ("In a
> long line of cases, we have said that when an officer has probable
> cause to believe a person committed even a minor crime in his
> presence, the balancing of private and public interests is not in
> doubt. The arrest is constitutionally reasonable." (citing, among
> other cases, *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S.
> Ct. 1536, 149 L.Ed.2d 549 (2001))).

*Id.* at 812-813. We ultimately held that, "[n]evertheless, we need not rely on

*Moore* because [the officer] had probable cause to believe [the defendant]

committed the offense of possession of paraphernalia as a Class A

misdemeanor." *Id.* at 813. We note *Moore* as well as at least one other case that addressed the issue. *See United States v. Burtton*, 599 F.3d 823, 828-830 (8th Cir. 2010) (observing that, although Nebraska law prohibited officers from arresting an individual for violating the open container law, state law violations do not necessarily offend the Federal Constitution; observing that the defendant's violation of the open container law constituted an "infraction," not a misdemeanor; holding that the question was whether the commission of an "infraction" in the presence of officers supplied the officers with probable cause to arrest the defendant under the Fourth Amendment; discussing *Moore*; and concluding that the defendant "unquestionably committed a 'minor crime'— violation of an open container law—in the presence of [the officer] when he was holding a 12-ounce plastic cup suspected of containing an alcoholic beverage in close proximity to a liquor bottle on the floor near" the defendant and, "[a]s a result, [the officer] had probable cause under the Fourth Amendment to arrest [the defendant] and conduct a search incident to arrest"), *reh'g denied*. Given our conclusion that the facts and circumstances would warrant a person of reasonable caution to believe that Brummett committed the act of driving without a license as a class C misdemeanor under Ind. Code § 9-24-18-1, we need not decide the impact of any distinction between an infraction and a misdemeanor upon a determination of probable cause.

[17] Even assuming that the search incident to arrest exception does not apply, we cannot say reversal is warranted. Generally, "[a] routine traffic stop . . . is a relatively brief encounter and 'is more analogous to a so-called 'Terry stop' . . .

than to a formal arrest.'" *Wilson v. State*, 745 N.E.2d 789, 791 (Ind. 2001) (quoting *Knowles v. Iowa*, 525 U.S. 113, 117, 119 S. Ct. 484, 488 (1998) (quoting *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S. Ct. 3138, 3150 (1984))).  The United States Supreme Court in *Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868 (1968), explained that police officers may employ investigative techniques short of arrest on less than probable cause without violating Fourth Amendment interests.  *Id.* at 792.  The principal issue is whether the police action in question was reasonable under all the circumstances.  *Id.* (citing *Pennsylvania v. Mimms,* 434 U.S. 106, 108-109, 98 S. Ct. 330, 332 (1977)).  "To determine whether an investigative stop was reasonable 'our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'"  *Id.* (quoting *Terry,* 392 U.S. at 19-20, 88 S. Ct. at 1879).

[18]  To conduct a patdown during a *Terry* stop, an "officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883.  "To determine whether an officer acted reasonably, we consider the specific, reasonable inferences that the officer, in light of his experience, can draw from the facts." *Johnson v. State*, 157 N.E.3d 1199, 1205 (Ind. 2020) (citing *Terry*, 392 U.S. at 27, 88 S. Ct. 1868), *cert. denied*, 141 S. Ct. 2681 (2021).  "In addition, a police officer 'justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to

the officer or to others,' is entitled to conduct a limited patdown search of the suspect's outer clothing to search for a weapon." *Jackson v. State*, 669 N.E.2d 744, 747 (Ind. Ct. App. 1996) (quoting *Terry*, 392 U.S. at 24, 88 S. Ct. 1868).

[19]     With respect to Brummett's argument that a reasonably prudent person in the circumstances would not be warranted in the belief that his safety or that of others was in danger, we disagree. To the extent Brummett cites *Hill v. State*, 956 N.E.2d 174 (Ind. Ct. App. 2011), *trans. denied*,[7] we find that case distinguishable. In *Hill*, officers with the Anderson Police Department initiated a traffic stop, and an occupant of the stopped vehicle fled the scene on foot. 956 N.E.2d at 175. Officer Keith Gaskill was in his patrol car nearby and heard a radio dispatch stating that a "light-skinned" black male had fled on foot from the traffic stop. *Id.* at 175-176. The dispatch also provided information that led Officer Gaskill "to the area of [the] 1600 block of Madison Avenue." *Id.* at 176. Officer Gaskill was driving slowly down an alley in that area when he saw a light-skinned black male pedestrian moving at a pace that "seemed quick[,] like he was leaving somewhere quickly." *Id.* "[G]iven the distance and the direction of the traffic stop" from Officer Gaskill's location, he surmised that the man might be the suspect police were seeking. *Id.* Officer Gaskill stopped his patrol car, exited the car, and approached the man, later identified as Dejuan Hill. *Id.* Officer Gaskill told Hill to stop and to walk towards him. *Id.*

---

[7] Justice Sullivan and Justice David voted to grant the petition to transfer.

Hill reached into his pants' pocket, but complied when Officer Gaskill instructed him to take his hand out of his pocket. *Id.* Officer Gaskill "felt" like Hill was preparing to flee. *Id.* Officer Gaskill described Hill's actions as follows:

> He was looking around. I've seen a lot of people flee from me and other officers. He was looking around rapidly, continued to back away, and stuck his hand down in his pocket. I asked him to remove that, [and Hill was doing] what I would call cocking his body and looking around for an avenue. I don't know if that explains it if you can visualize that but that's what I'm familiar with when people are looking for a way to get away from my presence.

*Id.* Officer Gaskill became suspicious of Hill given that he was a light-skinned black male who matched the description of the suspect; he was in a location consistent with where the suspect might be given information about the traffic stop and an address found on a pill bottle in the stopped car; and he gave inconsistent and nonsensical statements about his movements that evening. *Id.* Other officers arrived to assist Officer Gaskill, and Officer Gaskill still believed that Hill might flee. *Id.*

[20] "Officer Gaskill conducted a pat-down search of Hill's person, ostensibly for officer safety, which revealed a baggie containing a small amount of marijuana in Hill's pants pocket." *Id.* Officer Gaskill then arrested Hill and performed a second search incident to arrest. *Id.* No additional contraband was discovered. *Id.* Officer Gaskill transported Hill, who was in handcuffs, to the Muncie County Jail in the back of his patrol car. *Id.* En route, Officer Gaskill observed

Hill making movements with his body that suggested to Officer Gaskill that Hill was removing contraband from his person. *Id.* Once they arrived at the jail and Hill exited the car, Officer Gaskill searched the back seat and found a small gun under the seat. *Id.* at 176-177. Hill appealed his conviction for unlawful possession of a firearm by a serious violent felon as a class B felony. *Id.* at 175.

[21] On appeal, another panel of this Court agreed with Hill that the evidence did not support a determination that Officer Gaskill held a reasonable belief that Hill was armed and dangerous at the time of the patdown search. *Id.* at 177-178. The Court held:

> First, none of the information relating to the suspect who fled from the traffic stop indicated that he was armed or dangerous. Second, while Officer Gaskill testified that he "do[esn't] like" it when a suspect puts his hand in his pocket, like Hill did, Hill complied when Officer Gaskill told him to remove his hand from the pocket. Transcript at 11. And when asked whether he had "some concern about whether [Hill] would have a weapon" in his pocket, Officer Gaskill replied only that he is generally "concerned about people with weapons." *Id.*
>
> Finally, Officer Gaskill testified on redirect examination that his "motive" for the pat-down search was his "own safety" given the one instance of the hand in the pocket and the fact that Hill was "looking around and cocking his body, et[ ]cetera." *Id.* at 40. But, again, Hill put his hand in his pocket one time and complied when Officer Gaskill instructed him to remove it. And, as for the "looking around and cocking his body," Officer Gaskill had described those actions as indicative of Hill's apparent desire to flee. *Id.* In fact, while Officer Gaskill seemed very concerned that Hill looked like he was going to flee, he did not testify to facts that would support a reasonable, objective belief that Hill

was armed and dangerous. Officer Gaskill made no connection between the likelihood that Hill would flee with any likelihood that he would be armed and dangerous.

*Id.* at 178. The Court observed that the State made no argument that the evidence was not fruit of the poisonous tree, and it held that the gun found in the back seat of the patrol car did not have an independent source and the connection between the illegal search and the discovery of the gun was not attenuated. *Id.* at 179. It concluded that the trial court abused its discretion when it admitted the gun into evidence and reversed Hill's conviction. *Id.*

[22] Unlike in *Hill* where, when asked whether he had "some concern about whether [Hill] would have a weapon" in his pocket, Officer Gaskill replied only that he was generally "concerned about people with weapons," 956 N.E.2d at 178, the record in the present case indicates that Officer Reynolds relied upon Brummett's behavior. Officer Reynolds testified that he had safety concerns at the time Brummett was still in the vehicle and asked Brummett to exit the vehicle due to these concerns. He also stated: "[T]hrough my experience, my training and everything it . . . made me seem to think he was contemplating his next move . . . which in that situation I've had you know vehicles take off and then there's a vehicle pursuant [sic] or a door open and a foot chase or a fight or something like that." Transcript Volume I at 61-62. On cross-examination, when asked for the reason for conducting a patdown, he answered: "[I]n order to ensure that there was no type of weapon or anything that would be on his possession. So, safety." *Id.* at 69. While on cross-examination Officer

Reynolds mentioned that it was very common for people to carry weapons, the prosecutor asked if it was correct that Brummett's behavior also led to the patdown, and Officer Reynolds answered: "Oh yeah absolutely." *Id.* at 71.

[23] We also find that Brummett's behavior was different than Hill's behavior, which included merely moving at a pace that seemed quick, looking around, placing his hand in his pocket, cocking his body, complying when Officer Gaskill instructed him to remove his hand from his pocket, and giving inconsistent statements about his movements. *Hill*, 956 N.E.2d at 176. Brummett failed to respond to Officer Reynolds's questions, "sat there with his hands on the steering wheel," acted "really nervous," made furtive movements with his eyes, and "started freaking out." Transcript Volume I at 61, 71. We also note that other officers arrived to assist Officer Gaskill in *Hill* before he conducted the patdown search of Hill's person, *see Hill*, 956 N.E.2d at 176, while other officers had not arrived at the time Officer Reynolds conducted a patdown of Brummett. Further, unlike in *Hill*, Officer Reynolds testified that he was patrolling "a known high traffic area for narcotics." Transcript Volume I at 81. We conclude that a reasonably prudent person in the circumstances would be warranted in the belief that their safety or that of others was in danger and we cannot say the trial court abused its discretion in admitting evidence following the patdown.[8]

---

[8] To the extent Brummett asserts that Officer Reynolds "did not provide any testimony . . . that the item he felt in Brummett's pocket was immediately apparent as contraband," Appellant's Brief at 14, we note that

For the foregoing reasons, we affirm Brummett's conviction.

Affirmed.

Bradford, J., concurs.

Vaidik, J., dissents with separate opinion.

ATTORNEY FOR APPELLANT

Paul J. Podlejski
Anderson, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Catherine E. Brizzi
Deputy Attorney General
Indianapolis, Indiana

---

Officer Reynolds testified that he ran his hand across the outside of Brummett's right pocket, felt "an item through plain feel that felt consistent to be a pretty large amount of crystal methamphetamine" and felt the same thing in a smaller quantity in Brummett's left pocket. Transcript Volume I at 123.

**Vaidik, Judge, dissenting.**

I respectfully dissent from the majority's determination that the trial court properly admitted the methamphetamine found on Brummett's person because the search was either a valid protective search for weapons under *Terry v. Ohio*, 392 U.S. 1 (1968), or a valid search incident to arrest. Because I do not believe that the State met its burden of proving that either exception to the warrant requirement applied, I would reverse Brummett's conviction for Level 3 felony possession of methamphetamine.

Before trial, Brummett moved to suppress the methamphetamine found on his person, arguing that Officer Reynolds didn't have reasonable fear that he was armed and dangerous as required by *Terry*. Under *Terry*, "an officer may, if he has reasonable fear that a suspect is armed and dangerous, frisk the outer clothing of that suspect to try to find weapons." *Johnson v. State*, 157 N.E.3d 1199, 1205 (Ind. 2020) (citing *Terry*, 392 U.S. at 27). The State filed a response in which it only argued that this was a valid protective search for weapons under *Terry*.

At the suppression hearing, Officer Reynolds testified that when he pulled Brummett over for turning without properly signaling, Brummett said he didn't have a valid driver's license. Tr. pp. 68, 119. Officer Reynolds said that before he ran Brummett's information, he asked Brummett to exit his car and patted him down, finding methamphetamine in his pockets. As the majority points out, Officer Reynolds used all the right words to justify his pat down: Brummett

was driving in an area known for "drug activity," was "really nervous" and "freaking out a little bit," and made "some pretty furtive" eye movements. *Id.* at 57, 61, 71. Based on this, Officer Reynolds said he felt "uncomfortable" and had "safety concerns." *Id.* at 61, 62. But Officer Reynolds also testified that he patted Brummett down because it was his practice to pat everyone down:

> Um, I went ahead [and did] **the same thing I would do** you know **anytime I get someone out of the vehicle**, especially if there's a safety concern, I want to make sure they don't have any weapons or anything on him. So, I went ahead and did an out[er] clothing pat down.

*Id.* at 63 (emphases added). And when asked if Brummett had given him a reason to believe that he had a weapon on his person, Officer Reynolds responded:

> Um I think it's very common for most people to carry weapons. I myself . . . have at least . . . a knife on my person and um a lot of people carry weapons.

*Id.* at 69.

[29] After taking the matter under advisement for over two months, the trial court denied Brummett's motion to suppress. In doing so, it did **not** find that Officer Reynolds had reasonable fear that Brummett was armed and dangerous and therefore conducted a valid protective search for weapons. Instead, the court determined that the search was justified as a search incident to arrest, which was a basis neither party argued. This leads me to only one conclusion: the trial

court didn't believe Officer Reynolds when he said that Brummett was "freaking out," "really nervous," and making "furtive eye movements." Rather, the trial court believed Officer Reynolds when he said that he pats down everyone he gets out of their vehicle. *See*, *e.g.*, *Hill v. State*, 956 N.E.2d 174, 178 (Ind. Ct. App. 2012) (holding that a general concern that people carry weapons does not authorize a protective search for weapons under *Terry*), *trans. denied*; *I.G. v. State*, 177 N.E.3d 75, 77 (Ind. Ct. App. 2021) (noting that a police officer's practice to pat everyone down does not satisfy the pat-down exception).

[30] Despite the trial court's rejection of Officer Reynolds's testimony, the majority finds that this was a valid protective search for weapons under *Terry*. In doing so, the majority is necessarily re-judging Officer Reynolds's credibility, which we may not do. *See Washington v. State*, 922 N.E.2d 109, 111 (Ind. Ct. App. 2010). In case after case, we faithfully follow the time-honored rule of appellate judging: don't second guess a trial court's credibility determination. We adhere to this precept even though sometimes we must suspend our disbelief. Whatever the consequence, we are bound to defer to the trial court on whom to believe or disbelieve. Because the trial court did not believe Officer Reynolds's testimony, I cannot agree to affirm the admission of the methamphetamine on the basis that Officer Reynolds conducted a valid protective search for weapons under *Terry*.

[31] This, then, leaves the trial court's reasoning for admitting the drugs: the search-incident-to-arrest exception to the warrant requirement. According to this

exception, "once a lawful arrest has been made, authorities may conduct a full search of the arrestee for weapons or concealed evidence." *Edwards v. State*, 759 N.E.2d 626, 629 (Ind. 2001) (quotation omitted). "[A]s long as probable cause exists to make an arrest, the fact that a suspect was not formally placed under arrest at the time of the search incident thereto will not invalidate the search." *I.G.*, 177 N.E.3d at 78 (quotation omitted); *see also VanPelt v. State*, 760 N.E.2d 218, 223 (Ind. Ct. App. 2001) ("The critical issue is not **when** the arrest occurs but whether there was probable cause to arrest at the time of the search."), *trans. denied*. "Probable cause to arrest arises when, at the time of the arrest, the arresting officer knows of facts and circumstances that would warrant a person of reasonable caution to believe that the defendant committed the criminal act in question." *I.G.*, 177 N.E.3d at 78.

[32] As an initial matter, I am skeptical of the State's claim that this exception applies. At the suppression hearing, Officer Reynolds didn't testify that he was arresting or planning to arrest Brummett or that he performed a full search, which is what a search incident to arrest entails. Rather, he testified that he performed a limited search for weapons. This is presumably why the State did not argue the search-incident-to-arrest exception below.

[33] But even if the State had argued this exception below, I do not believe that it applies. Indiana Code section 9-24-1-1 provides that operating a motor vehicle without a **valid** license—which Officer Brummett testified that Brummett admitted to—is an infraction, not a misdemeanor. According to Indiana Code section 35-33-1-1(a)(4), a police officer may arrest a person when the officer has

probable cause to believe that the person is committing or attempting to commit a **misdemeanor**—not an infraction—in the officer's presence. *See also Taylor v. State*, 842 N.E.2d 327, 333 n.6 (Ind. 2006).

[34] It is true that Indiana Code section 9-24-18-1 provides that it is a Class C misdemeanor for a person to knowingly or intentionally operate a motor vehicle **without ever receiving a valid driver's license**. However, there was no indication at the time of the search that Brummett had never received a driver's license. Rather, the indication was that he didn't have a valid one. *See* Tr. p. 119 ("I asked him at that time if he had a valid driver's license, and he said no he didn't."); *see also id.* at 68. As such, I believe the State failed to prove that the search-incident-to-arrest exception applied. I would therefore reverse Brummett's conviction for possession of methamphetamine.